**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**NATHANIEL LAMBERT, #90883**          **CIVIL ACTION**

**VERSUS**                                          **NO. 06-0721**

**BURL CAIN, WARDEN**                        **SECTION "S"**

## REPORT AND RECOMMENDATION

This matter was referred to the United States Magistrate Judge for the purpose of conducting hearings, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.  Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing.   For the following reasons, **IT IS HEREBY RECOMMENDED** that the instant *habeas corpus* petition be **DENIED with prejudice.**

Lambert is a state prisoner who was convicted, following a jury trial, of one count of aggravated rape (La. Rev. Stat. 14: 42), one count of aggravated crime against nature (La. Rev. Stat. 14: 89.1), and one count of aggravated burglary (La. Rev. Stat. 14:60).

The state district judge sentenced petitioner to a term of life imprisonment without benefit of probation, parole, or suspension of sentence for the aggravated rape conviction, a term of thirty years imprisonment for the aggravated burglary conviction, and  a term of 15 years imprisonment for the aggravated crimes against nature conviction.[1]  Thereafter the state judge adjudicated petitioner to be a fourth felony offender pursuant to La. Rev. Stat. 15:529.1 on the aggravated burglary conviction.  The state judge vacated the previously imposed sentence for that conviction, and sentenced Lambert to a term of life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence.   Petitioner appealed the convictions and sentences.

The state court of appeals affirmed petitioner's conviction.  *State v.Lambert*,749 So.2d 739 (La. App. 4th Cir.  1999).  The Louisiana Supreme Court denied petitioner's application for a writ of *certiorari.  State v. Lambert*, 781 So.2d 1258 (La. 2001)

Thereafter, Lambert  filed a petition for *habeas corpus*  relief in the state district court.  He later filed a supplemental brief in support of his petition for *habeas relief* and then filed a motion to withdraw that supplemental brief.  Petitioner then filed a second application for post conviction relief in the state district court.  The state district judge denied petitioner relief.  The state court of appeals granted in part  petitioner's application for a supervisory writ, ordering the state district court to conduct an evidentiary hearing on petitioner's claim that "counsel was ineffective for failing to present two witnesses, who

---

[1] The judge ordered each of the terms of imprisonment to be served at hard labor.

allegedly had seen [Lambert] with the victim prior to the crimes charged." *State v. Lambert*, No. 2002-K-0347 (La. App. 4th Cir. April 11, 2002).  The state court of appeals denied the writ on all other grounds.  Following a series of evidentiary hearings, the state district judge denied Lambert's claim that counsel's failure to present at trial two witnesses denied petitioner effective assistance of counsel.  *State v. Lambert*, No. 387-752 (Criminal District Court Parish of Orleans  April 20, 2004).  The Louisiana Supreme Court denied petitioner's application for writs.  *State ex rel Lambert  v. State*, 908 So.2d 650 (La. 2005).

Petitioner contends that his convictions  and sentences  should be vacated because his counsel rendered ineffective assistance and because the trial judge erred in admitting statements made by petitioner which he did not make freely and voluntarily. Petitioner raised each of these claims in the proceedings described above.  Therefore, he has exhausted the available state court remedies.  *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982); *Depuy v. Butler*, 837 F.2d 699 (5th Cir. 1988).

<u>TIMELINESS</u>

The state urges that petitioner's claims are time barred under Title 28 U.S.C. §2244(d); this court disagrees.  Title 28 U.S.C. §2244(d) establishes  a one-year period of limitation  for filing a federal *habeas corpus* motion, providing in pertinent part:

> (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of –
>
>> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking

such review;
(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from filing by such State action;
(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Under §2244, petitioner had 365 days after his convictions became final to file a petition for federal *habeas corpus* relief, tolled only for the days on which a "properly filed" application for state *habeas* relief was pending. Petitioner's convictions became final on April 26, 2001, the last day on which he could have applied for a writ of *certiorari* to the United States Supreme Court, following the Louisiana Supreme court's denial of his application for writs. *See Ott v. Johnson*, 192 F.3d 510, 513 (5th Cir. 1999).

"The time during which a properly filed application for State post-conviction relief or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation. . . ." 28 U.S.C. §2244(d)(2). An application for state post-conviction relief "is pending as long as the ordinary state collateral review process is 'in continuance' – i.e., 'until the completion of' that process." *Carey v. Saffold*, 536 U.S. 214, 219-20, 122 S.Ct. 2134, 2138, 153 L.Ed.2d 260 (2002). "In other

words, until the application has achieved final resolution through the State's post-conviction procedures, by definition its remains 'pending.'" *Id.*; *Melancon* v. *Kaylo*, 259 F.3d 401, 406 (5th Cir. 2001). However, an application ceases to be "pending" when application to the next level of state-court review is not timely made. *Id.*

Because petitioner filed a petition for state *habeas corpus* relief with the state district court prior to the expiration of the ninety day period for filing an application for a writ of *certiorari* with the United States Supreme Court, none of the 365 day limitation period elapsed prior to Lambert filing his petition for state post-conviction relief. After filing his petition for state *habeas* relief, petitioner filed a supplemental brief in support of that petition, but then moved to dismiss the supplemental brief. Thereafter, petitioner filed another petition for *habeas* relief in the state district court. The state contends that during the sixty- three day period  between the date Lambert  filed his motion to withdraw the supplemental brief and the date he filed the second state *habeas* application the limitation period of §2244 was not tolled because during that period no "properly filed" application for state *habeas* relief was pending. The state court record, however, contains no documentation that the state judge ever ruled on Lambert's motion to withdraw. Absent an order granting the motion to withdraw, petitioner's application for state *habeas* relief remained pending, thereby tolling the limitation statute.

The state concedes that after July 6, 2001, the date petitioner filed his second application for state *habeas* relief, the limitation period remained tolled until April 20, 2004, the date the state district court denied Lambert's claim that his trial counsel rendered

5

ineffective assistance by failing to present two witnesses at trial who allegedly saw petitioner with the victim on the day of the crimes.

Pursuant to Rule 4-3 of Louisiana's Uniform Rules, Court of Appeals, petitioner had thirty days, or until May 20, 2004, within which to timely file an application for writs with the state court of appeals, absent being granted an extension of that period. He did not do so. Once a state limitation period expires "a petitioner is not entitled to further appellate review, and therefore, he has no application 'pending' in the state court." *Melancon v. Kaylo*, 259 F.3d at 407.

> A state court's subsequent decision to allow review may toll the time relating directly to the application, but it does not change the fact that the application was not pending prior to the application. Thus, after the appeal period has lapsed, an application ceases to be pending but a subsequent properly filed application entitles the petitioner to additional tolling beginning at the time of the "proper" filing.

*Id.*

Because Lambert did not timely file his application for writs with the state court of appeals, nor request or receive an extension for filing his application for writs, his *habeas* application ceased to be "pending" within the meaning of §2244 on May 20, 2004. Louisiana applies the prison "mailbox rule", i.e., a prisoner's *pro se* pleading is considered "filed" when it is delivered to prison officials for mailing. The record does not indicate when petitioner delivered to prison officials his application for writs to the state court of appeals. However, petitioner signed the application for writs on September 12, 2004. The date that a *pro se* petitioner signs his petition is presumed to be the date he delivered it to

the prison official for mailing. *Sanderson v. Herbert*, 2007 WL 2081085 *3 (E.D. La. July 19, 2007); *see Colarte v. Leblanc*, 40 F.Supp. 2d 816,817 (E.D. La.); *Punch v. Stat*, 1999 WL 562729, *2 n.3 (E.D. La. 1999). The state has not presented any evidence rebutting that presumption. One hundred and fifteen (115) days of the limitation period elapsed between May 20, 2004 and September 12, 2004, the date petitioner "filed" his application for writs to the state court of appeals. That application remained pending until it was denied by the state court of appeals on October 4, 2004. Petitioner then had thirty days, until November 3, 2004, to file a timely application for writs with the Louisiana Supreme Courts. Rules of the Supreme Court, Rule 10.5. Again, the record does not reveal the date on which petitioner delivered to prison officials his application for writs to the Louisiana Supreme Court.[2] However, because the record contains a copy of the envelope used to mail the application for writs which is postmarked November 4, 2004, The court concludes that the application was timely "filed" with the Louisiana Supreme Court thereby tolling the limitations period until August 19, 2005, the date the Louisiana Supreme Court denied petitioner's application for writs.

After the Louisiana Supreme Court denied Lambert's application for writs, petitioner allowed a maximum of 158 days to elapse before he filed this petition for federal *habeas corpus* relief.[3] Because petitioner allowed only 273 days (115 days + 158 days) of

---

[2]Additionally, the application for writs does not indicate the date that it was signed.

[3] The federal courts also use the "mailbox" rule in determining when pleadings filed by prisoners acting *pro se* are considered filed. *Lara v. Johnson*, 141 F.3d 239, 241, n.2 (5th Cir. 1990), *Cooper v. Brookshire*, 70 F.3d 377, 379 (5th Cir. 1995), *Thompson v. Raspberry*, 993 F.2d

the 365 day limitation period to elapse, this petition for *habeas corpus* relief pursuant to 28

U.S.C. §2254 is timely.

<u>STANDARD OF REVIEW</u>

28 U.S.C. § 2254(d) mandates that claims adjudicated on the merits in state

court proceedings are subject to the following standards of review:

> (d) An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court
> shall not be granted with respect to any claim that was
> adjudicated on the merits in State court proceedings unless the
> adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved
> an unreasonable application of, clearly established Federal law,
> as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in
> the State court proceeding.

In *Drinkard v. Johnson,*[4] the Fifth Circuit Court of Appeals analyzed the

standards of review set out in §2254(d) and held that when reviewing questions of fact

which were previously adjudicated on the merits by a state court, a federal court may grant

habeas relief only "if the state court adjudication of the claim 'resulted in a decision that was

based on an unreasonable determination of the facts in light of the evidence.'" *Id.* (citing 28

---

513, 515 (5th Cir. 1993). The record does not indicate when the pleading was delivered to prison officials for mailing; nor does it indicate the date on which Lambert signed the petition. However, the envelope in which it was sent is postmarked January 23, 2006.

[4] 97 F.3d 751, 767-68 (5th Cir. 1996), *cert. denied*, 520 U.S.1107, 117 S.Ct. 1114, 137 L.Ed.2d 315 (1997), *overruled in part on other grounds, Lindh v. Murphy*, 521U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

U.S.C. § 2254(d)(2)).  As for questions of law, "a federal court may grant *habeas* relief only if it determines that a state court's decision rested on a legal determination that was contrary to . . . clearly established Federal law, as determined by the Supreme Court."  *Id.* at 768. Where a mixed question of law and fact is being reviewed, "a federal court may grant *habeas* relief only if it determines that the state court decision rested on 'an unreasonable application of [] clearly established Federal law, as determined by the Supreme Court of the United States,' to the facts of the case."  *Id.* at 768 (*quoting* 28 U.S.C. § 2254(d)(1)).  "[A] decision is contrary to clearly established Federal law 'if the state court arrives at a conclusion opposite to that reached [by the Supreme Court] on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts.'"  *Knox v. Johnson,* 224 F.3d 470, 476 (5th Cir. 2000) (*quoting Williams v. Taylor,* 529  U.S. 362, 413, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000)). A writ may be granted based upon a state court's unreasonable application of federal law only "if the state court identifies the correct governing principle . . . but unreasonably applies the principle to the facts of the prisoner's case. "  *Id.* "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable."  *Williams v. Taylor*, 529 U.S. at 409, 120 S.Ct. at 1521.

## FACTUAL BACKGROUND

The state court of appeals summarized the facts as follows:

New Orleans Police Officer Daniel Jewel testified that, at approximately 2:23 a.m. on 7 January 1997, he and Officer Richard Bonay responded to a report of an aggravated burglary at 2326 Louisiana Avenue. The victim, T.T., met the officers at the door. Officer Jewel said the victim was visibly upset but appeared "rather calm." She escorted the officers to the back of the residence where defendant was lying on a bed asleep, completely naked except for his shoes and socks. When the officers turned on the light, Officer Jewel noticed a hammer within defendant's reach, picked it up and moved it to the next room. Officer Jewel said they woke defendant, who appeared drunk or drugged. Officer Jewel asked defendant what he was doing; defendant responded that he was sleeping with his girlfriend. When asked where he was, he said he was in the "Hollygrove" area, which Officer Jewel said was on the other side of the Second Police District from the Louisiana Avenue residence. When asked for his girlfriend's name, defendant stated that it was "Dianne," which was not the victim's name. Defendant was ordered to put on his clothes and was handcuffed. Officer Jewel said at that point T.T. cowered in a corner and started to cry-"freaking out," according him.

On cross-examination, Officer Jewel said he did not write anything down that the victim told him, as rape investigators handle all the reports in rape cases. He did testify that the victim told him defendant had entered the residence through the rear door and that he had observed that the rear door had been kicked in. Officer Jewel said that, based on his questioning of defendant and information from the victim, he concluded that defendant did not know the victim and did not belong there. He admitted that defendant did not

resist arrest.

Dr. James Moises, who was qualified by stipulation as an expert in the field of emergency medicine, testified that he reviewed medical records pertaining to a sexual examination of T.T. The history reflected that the victim reported that someone broke into her residence and assaulted her multiple times, vaginally and orally. Dr. Moises said the examining physician noted some redness and tenderness to the touch in the lower portion of her vaginal opening, which he said was consistent with the history given. Seminal fluid containing sperm was found in the vaginal area and the insides of the thighs, which Dr. Moises said was consistent with ejaculation outside of the vaginal area. On cross-examination, Dr. Moises agreed that, disregarding the history section, the examination was perfectly consistent with an examination of someone who had engaged in consensual sex.

Patricia Daniels, a medical technologist with the Orleans Parish Coroner's Office, was qualified by stipulation as an expert in the field of medical technology. Ms. Daniels identified a rape kit labeled with the police item number in the instant case. She said that tests performed on two internal and two external vaginal swabs, as well as an anal swab, were positive for seminal fluid; and she said internal and external vaginal smears were positive for spermatozoa. Oral swabs tested negative for the presence of seminal fluid, and oral and rectal smears were negative for the presence of spermatozoa. Ms. Daniels said the victim had type "O" blood, and she detected type "O" blood substance on secretor tests performed on the internal vaginal swab and the victim's saliva. On cross-examination, Ms. Daniels said that her test results show that sexual intercourse took place but that she could make no

determination as to whether the intercourse was consensual.

Senior Police Dispatcher Addia Skipper, a supervisor in the New Orleans Police Department's Communication Division, testified that she was the custodian of records of complaint histories. Ms. Skipper identified an "incident" from the 911 call from the victim's residence which came in at 2:23 a.m. The caller stated that an unknown male armed with a hammer had broken in through her back door and raped her. The caller said that the person was sleeping naked in a bed, wearing tennis shoes, and that she was hiding in a closet.

T.T., who was twenty-seven years old, testified that on the night in question she had watched television and had taken an over-the-counter cold remedy to relieve a sinus problem. She went to sleep in her mother's bedroom at ten or eleven o'clock; her mother was at work. She was awakened by a crashing sound which came from the rear of the "shotgun"-style residence. She left the bed and ran toward the sound, encountering the defendant with a hammer in his hand. When she asked him what he was doing in her house, he responded that he was attempting to break into the liquor store next door. He asked if she had a screwdriver; and when she said she did not, he said, "Well, okay, b----. If you don't do exactly what I tell you, the next thing anybody [is] going to see when they come into this house is your brains splattered up against the wall." Defendant then ordered T.T. to take off her clothes, kneel down, and perform oral sex on him. Defendant took off his shorts and pointed the hammer at her head; she complied with his orders.

Defendant then asked her if anyone else was home and walked her to the front bedroom of the

house, where he turned off the television. He took off all of his clothes, sat on the edge of the bed, and ordered her to perform oral sex on him. Defendant then lay down on the bed, grabbed the victim, laid her on top of him, and vaginally raped her. He attempted anal intercourse, and then continued to vaginally rape her, constantly demanding oral sex. He kept calling the victim a "b----" and berating women in general. The victim said that she feared for her life, as defendant kept the hammer either in his hand or near him on the bed. After approximately two hours, defendant fell asleep with the victim on top of him. She carefully freed herself from his grasp, unplugged the telephone in that room, and took it into the rear bedroom where she dialed 911.   T.T. further testified that she did not consent to any sexual activity with defendant and that she had never met the defendant before he entered her home that night.

On cross-examination, the victim denied ever being "convicted for cocaine" and denied that she smoked crack cocaine. She denied having met defendant at 7:30 p.m. on the evening in question or asking him to repair her back door. She denied that someone named Trey, or Troy Johnson, broke down her door; she also denied that "Troy" stole food stamps from her because she owed him money for crack cocaine. T.T. denied meeting defendant before the night of the rape and denied ever encountering him as a crack dealer in her neighborhood. She denied borrowing a hammer from one Jill Cats; denied coming back to her residence to smoke marijuana; denied planning with the defendant a burglary of the nearby liquor store; denied having sex with the defendant in return for crack cocaine; and denied taking defendant's crack cocaine and money and then accusing him of

rape to protect herself from him after his discovery of her theft.

The defendant testified on his own behalf and told a very different story than that told by T.T. Defendant testified that he was a forty-four year old merchant seaman. He said on the night in question he was living at the "Brown Sugar Laundromat" and that T.T., whom he met in December of 1996 and knew by the nickname of "Shorty," had asked him, whom she called "Bubblehead," to help fix her door. She told him someone named Trey, from whom she had obtained some crack cocaine, had pushed in her door, hit her, and taken her food stamps and some money. Defendant said he advised T.T. that Trey would hurt her and then asked if she had a hammer to fix the door. T.T. did not have a hammer, so she went to "Jill's" house to get one. He went to the store and purchased a beer, some iced tea, and a pack of "weed papers." The two entered T.T.'s residence, and she asked defendant if he had any crack cocaine. She said that fixing the door could wait, rolled some tobacco in a cigarette paper with the crack, and smoked it with defendant. Defendant said they were sitting on the bed, and the victim started performing oral sex on him. They then had intercourse.

Afterward, the victim asked for more cocaine. Defendant said similar events transpired for three or four hours. Defendant denied raping the victim, burglarizing her residence, or threatening her with a hammer. Defendant said he had approximately three hundred and sixty dollars and four hundred and forty dollars in crack cocaine on his person. Defendant said that around midnight he informed the victim that he was going to stay at a hotel, but that she told him he could spend the night at her house, as long as he "break her off." Defendant gave the victim

14

two rocks of cocaine and twenty dollars in cash and went to sleep. He said the police eventually woke him up. Defendant said he told the police that the victim was a friend of his and denied her claim of rape. Defendant said a dark-haired officer told him that he did not think defendant would rape a woman and go to sleep. One officer said he would help defendant out if he told them who had the "guns around here." Defendant said he knew nothing about guns in the area. Defendant said he did not notice until he was being taken to Central Lockup that his cocaine and money were not in his pocket.

Defendant admitted to a 1979 armed robbery conviction; a 1983 aggravated battery conviction; a 1990 conviction for theft; and 1993 convictions for possession of cocaine and carrying a concealed weapon as a convicted felon. Defendant clarified the fact that there was no "Brown Sugar Laundromat," but that "Brown Sugar" was a record store next to a laundromat. When defendant was asked whether he normally had sex with his shoes on, he answered, "It all depends where I'm at." He said T.T. routinely bought cocaine from him and other males in the neighborhood. Defendant said he smoked about three or four rocks of crack cocaine between 9:00 and 10:00 p.m. on the night in question.

On rebuttal the victim's mother, E.T., testified that her daughter works and is just a "home child," meaning that rarely leaves the house. She said she did not have any trouble with T.T. running the streets, going to barrooms, smoking or drinking; and she said had never heard her daughter called "Shorty." She claimed that she would kill T.T. if she found T.T. interacting with crack dealers or smoking crack cocaine. . . .

The State also called in rebuttal New Orleans Police Officer Richard Bonay, Jr., who had responded to the aggravated burglary call with Officer Jewel (who had blonde hair). Officer Bonay denied asking defendant where any guns were in the neighborhood and stating that he did not believe the incident was a rape. He said there was very little conversation, stating that they put defendant into the back of a police car by himself, while they stood on the porch.

## USE OF INVOLUNTARY STATEMENTS

Petitioner contends that because he was intoxicated at the time of his arrest, statements he made to police officers at that time were not freely and voluntarily given, and therefore the admission of Officer Jewel's testimony concerning those statements violated petitioner's Fifth Amendment right against self incrimination.  Petitioner also asserts that the statements were improperly admitted because the officers at the scene did not advise him of his *Miranda* rights and because the state failed to provide written notice of its intent to use the  statements at trial in violation of Louisiana Code of Criminal Procedure article 768.

Federal *habeas* review is limited to questions of constitutional dimension. *Sawyer v. Butler*, 881 F.2d 1273 (5th Cir, 1989).  The state's alleged failure to provide Lambert with written notice of its intent to use petitioner's statements at trial does not implicate a constitutional right.

The two remaining claims involving the prosecution's use of statements made by petitioner at trial, i.e., that petitioner was not advised of his *Miranda* rights prior to his

16

arrest, and that the statements were not given freely and voluntarily,  present issues of

constitutional magnitude.  At petitioner's trial, Officer Jewell testified that after he arrived

at the victim's house, the victim directed him to the bedroom where petitioner was asleep

on the bed.  Officer Jewell  awakened Lambert, and asked him  "[w]hat are you doing?"

Officer Jewell testified that Lambert:

> said something like, "Sleeping with my girlfriend", or
> something like that.  So I said, "Really?, where are you?"  And
> he said he was in the Hollygrove area, which is completely
> across the district.  I said, "Well, you are on Louisiana
> Avenue."  He was like, "No, I'm not."  I said, "What's your
> girlfriend's name?"  He said, "Diane", or something to that
> affect [sic].  I believe it was Dianne.

> We didn't know  what the lady's name was yet because just
> went in to secure the building first.  My partner or I – I can't
> remember who asked her, but it was asked, "What's your
> name?", and she said, Tina.

> At this point, we told him to put his clothes on.  He did.  He
> cooperated.  No problems.  We cuffed him, and sat him down,
> . . .

State Court Record, Vol. 2, Trial Transcript, p. 24.

"An individual's   Fifth Amendment right against self-incrimination is

implicated only during a 'custodial' interrogation."   *Murray v. Earle*, 405 F.3d 278, 285

(5th Cir. 2005).   A "custodial interrogation" is one involving "questioning initiated by law

enforcement officers after a person has been taken into custody."  *United States v. Gonzalez*,

121 F.3d 928, 939 (5th Cir. 1997)(internal quotations omitted).  A disjunctive test applies in

determining whether an individual is "in custody" for the purpose of determining whether questioning by law enforcement personnel constitutes a "custodial interrogation."  "A suspect is 'in custody' for these purposes either (1) when he is formally arrested or (2) when a reasonable person in the position of the suspect would understand the situation to constitute a restraint on freedom of movement to the degree that the law associates with formal arrest."  *Murray v. Earle,* 405 F.3d at 286 (internal quotation omitted).

Petitioner does not dispute that he had not been formally arrested at the time he made the challenged statements to Officer Jewell.  Therefore, the Fifth Amendment is implicated only if a reasonable person in Lambert's position would have thought that in the same situation his movement was restrained to the degree associated with formal arrest.  The state court did not unreasonably apply clearly established federal law to the facts of this case in rejecting this claim.

There is no evidence establishing that after Officer Jewell awakened Lambert that either Officer Jewell or his partner physically restrained petitioner in any way.  Officer Jewell testified that he and his partner positioned themselves "properly in case [Lambert] did jump up," but there is no evidence that the officers had drawn their weapons or otherwise restrained petitioner in any manner.  Moreover, Officer Jewell testified that he asked Lambert "[w]hat are you doing?" because the officers did not understand what the situation was.  The officers made no accusations during the questioning of Lambert, and asked only questions seeking general information, i.e., what are you doing, where are you,

and what is the name of your girlfriend.  None of those questions accuse petitioner of criminal behavior or  indicate that petitioner's movement had been restrained.  Because a reasonable person in the same circumstances would not have understood the situation to restrain his movement to the extent associated with a formal arrest, the court concludes that the challenged statements were not made during a custodial interrogation.  Therefore, it was not necessary for the police officers to advise petitioner of his *Miranda* rights prior to questioning him at the victim's home.

Petitioner urges that the trial court erred in permitting Officer Jewell to testify concerning petitioner's statements because Lambert could not have given the statements freely and voluntarily because he was "drunk" at the time he made the statements.  There is no need to determine whether the statements were in fact made freely and voluntarily; even if the trial judge erred in admitting the statements, petitioner is not entitled to the relief sought.

A petitioner is entitled to *habeas* relief due to the improper admission of evidence only if the admission of that evidence was not harmless error under *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 253 (1993).

> "Under *Brecht*, a constitutional trial error is not
> so harmful as to entitled a defendant to habeas
> relief unless there is *more* than a mere reasonable
> possibility that it contributed to the verdict.  It
> must have had a *substantial* effect or influence in
> determining the verdict. We recognize, however,
> that if our minds are in virtual equipoise as to the
> harmlessness, under the *Brecht* standard, of the

> error, then we must conclude that it was harmful.
> Moreover, the *Brecht* standard does not require
> in order for the error to be held harmful that there
> be a reasonable probability that absent the error
> the result would have been different."

*Tucker v. Johnson*, 242 F.3d 617, 629 (5th Cir. 2001) *quoting Corwin* v. *Johnson*, 150 F.3d

467, 500 (5th Cir. 1998) (brackets, internal citations and internal quotations omitted).

The challenged statements concerned what Lambert was doing at the victim's

house, where he was, and the name of his girlfriend.  Specifically, Officer Jewell stated that

when Lambert was asked what he was doing at the at the house he stated "something like,

'[s]leeping with my girlfriend', or something like that."  Officer Jewell also testified that

when he asked Lambert "where are you?" Lambert said that he was in the "Hollygrove area"

and that when told he was on Louisiana Avenue he responded "No, I'm not."  When Officer

Jewell asked Lambert his girlfriend's name, Lambert identified his girlfriend as "Dianne";

the victim's name was not Dianne.

There is less than a "mere reasonable possibility"  that the statements

attributed to Lambert had a substantial influence or effect in determining the verdict.  The

statements made by petitioner contained only insignificant information.  None of the

information contained in the statements challenged by Lambert established any essential

element of any of the crimes of which the jury convicted petitioner.  The victim's testimony

provided persuasive evidence of petitioner's guilt for each offense.  Moreover, by electing

to testify, petitioner gave the jury the opportunity to hear his version of the facts, which the jury, as it was entitled to do, found to be non-credible. This claim lacks merit.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner urges that trial counsel provided ineffective assistance at trial by failing to call Shelia Webb and Winston Winn as witnesses during the trial and by failing to establish that because petitioner was drunk at the time he answered Officer's Jewell's questions, he could not have freely and voluntarily made the statements attributed to him. Issues of ineffective assistance of counsel raise mixed questions of fact and law. *Virgil v. Dretke*, 446 F.3d 598, 604 (5th Cir. 2006). Therefore, petitioner is entitled to *habeas* relief on a claim of ineffective assistance of counsel only when the state court unreasonably applied clearly established federal law to the facts of the case. Such is not the case here.

In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court established a two prong test for evaluating claims of ineffective assistance of counsel: a defendant seeking relief must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense. With regard to the performance prong, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id*. at 688, 104 S.Ct. at 2064. There is a strong presumption that an attorney's performance "falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. at 2065. The defendant must overcome the

21

presumption that the challenged action might be considered to be sound trial strategy. *Id.* (internal quotation and citation omitted).

In order to satisfy the prejudice requirement, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. at 694, 104 S.Ct. at 2068.  It  is clear that even "professionally unreasonable" errors on the part of counsel do not warrant setting aside a conviction if the error had no effect on the proceeding. *Larsen v. Maggio*, 736 F.2d 215 (5th Cir. 1984).

The burden of demonstrating prejudice rests on the defendant.  *Strickland v. Washington*, 466 U.S. at 693, 104 S.Ct. at 2067.  The defendant must demonstrate that an alleged error actually had an adverse effect on the defense";  that the `might have beens' [at trial] would have been important enough to affect the proceedings' reliability." *Larsen v. Maggio*, 736 F.2d at 218.   If  the  defendant  makes  an  insufficient  showing  on  either component of the ineffective assistance of counsel inquiry, it is not necessary to examine the remaining prong of the test.  *Strickland v. Washington*, 466 U.S. at 697, 104 S.Ct. 2069.

Petitioner contends that his counsel rendered ineffective assistance by failing to establish that statements made by Lambert  to Officer Jewell were not freely and voluntarily made.  No extensive analysis of this claim is necessary.  For the reasons discussed herein above in connection with petitioner's claim that his convictions should be vacated

because the trial court admitted statements which Lambert did not freely and voluntarily make, the court finds that petitioner has failed to establish that he suffered prejudice as a result of his counsel's alleged failure to establish that the Lambert's statements to Officer Jewell were not freely and voluntarily made.  The standard for establishing the prejudice prong of the *Strickland* test is far heavier than the burden necessary to establish  that an error does not qualify as harmless error.  It is clear that having failed to establish that there is less than a mere reasonable possible that the introduction of the statements had a substantial influence or effect in determining the verdict, petitioner cannot establish that he sustained *Strickland* prejudice due to his counsel's failure to establish that the statements were not freely and voluntarily made.

Petitioner also asserts that his counsel rendered ineffective assistance because he failed to call Shelia Webb and Winston Winn as defense witnesses.  The state court held a series of evidentiary hearings concerning these claims prior to rejecting the claims.  The state court  did not unreasonably apply clearly established federal law to the facts of this case in rejecting these claims.

Mr. Winn did not testify at any of the evidentiary hearings; however, prior to the hearings he executed a non-notarized affidavit which petitioner submitted in support of his state claim for *habeas* relief.  Mr. Winn's  affidavit stated that  on January 6, 1997, while he was speaking with petitioner,  the victim called petitioner.  Mr. Winn  did not know what petitioner and the victim discussed.  Lambert urges that Mr. Winn's testimony would have

23

been significant to the defense because it establishes that the victim knew petitioner, thereby contradicting  the victim's testimony that she did not know petitioner at the time of the crimes.

Petitioner's defense at trial was that he knew the victim, that she had invited him into her home, and that she consented to the various sexual activities in which they engaged.  Mr. Winn's testimony would not have presented the jury with facts not otherwise introduced at trial.  Petitioner testified to the same fact that would have been established through Mr. Winn's testimony, i.e.,  the victim called Lambert.

Moreover, the state had a strong case against the defendant, including the tape recording of the victim's 911 telephone call seeking police assistance, the victim's testimony, and  Officer Jewell's testimony concerning the victim's mental state during the time the police were at the victim's house.  Additionally Officer Jewell testified that when he entered the bedroom where petitioner was sleeping, there was a hammer close to petitioner's right hand, and that when he arrived, petitioner was asleep on the bed naked except for his shoes and socks.  Considering the strength of the prosecution's case, there is no reasonable probability that Mr. Winn's collaboration of petitioner's testimony that  the victim knew petitioner and called him that day would have resulted in a different outcome.  Petitioner has failed to satisfy the prejudice prong of the *Strickland* test.        Nor has petitioner established that he experienced prejudice sufficient to meet the *Strickland* test due to his counsel's failure to call Shelia Webb as a defense witness.  During a  state evidentiary hearing Ms. Webb

testified that she saw the victim and petitioner together in January 1997 and that "I assume he was going to fix something for her because he had a hammer and some tools, and they was going to her house together." Transcript of February 18, 2004 Evidentiary Hearing, at p. 4. Ms. Webb also testified that she "called him and – to ask him to lend me some money because at the time I was on drugs", and that when he gave her some money he told her "I'm going to fix her door, she want me to fix her door for her." *Id.* Additionally, Ms. Webb testified that while Lambert spoke to her, the victim waited on her porch for petitioner, and that after he finished talking to her, petitioner went "up the stairs on [the victim's] porch" and that they entered the house together. Transcript of February 18, 2004 Evidentiary Hearing, p. 5. Ms. Webb also testified that she had seen the victim and petitioner together prior to the day that she saw Lambert with the hammer. *Id.* at p. 14.

Any benefit that Ms. Webb's testimony might have had on the jury is seriously undermined by the fact that some critical portions of her testimony are inconsistent with petitioner's testimony at trial. Petitioner testified that he sent the victim to another person's house to pick up a hammer to fix the door, and that he did not see the hammer until the victim gave it to him once they were in the house. Trial Transcript, p. 60, 69. That testimony contradicts Ms. Webb's testimony that petitioner possessed the hammer outside the house when he stopped to talk to her. Additionally, petitioner's testimony does not indicate that he and the victim were together on the street as Ms. Webb testified. Moreover, petitioner's testimony does not mention an encounter with Ms. Webb. Considering the

inconsistencies between petitioner's testimony and Ms. Webb's testimony, there is not a reasonable probability that had defense counsel called Ms. Webb as a witness the outcome of the trial would have been different. Accordingly,

IT IS HEREBY RECOMMENDED that Nathaniel Lambert's  petition for *habeas corpus* relief be DENIED WITH PREJUDICE. A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed

factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996).

New Orleans, Louisiana this <u>13th</u> day of November, 2007.

_____

LOUIS MOORE, JR.
UNITED STATES MAGISTRATE JUDGE